1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE BP PRUDHOE BAY ROYALTY
TRUST SECURITIES LITIGATION

CASE NO. C06-1505 MJP

ORDER DENYING DEFENDANTS'
MOTION TO DISMISS

The above-entitled Court, having received and reviewed:

1.     Defendants' Motion to Dismiss Consolidated Amended Class Action Complaint (Fed. R. Civ. P. 12(b)(6)) (Dkt. No. 42.)

2.     Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss Consolidated Amended Class Action Complaint (Dkt. No. 46.)

3.     Defendants' Reply in Further Support of their Motion to Dismiss Consolidated Amended Class Action Complaint. (Dkt. No. 47.)

4.     Consolidated Amended Class Action Complaint (Dkt. No. 30.)

and all exhibits and declarations attached thereto, makes the following ruling:

IT IS HEREBY ORDERED that the motion is DENIED.

**Background**

The facts are described as they are alleged in the Plaintiffs' Complaint. On March 2, 2006, Prudhoe Bay oilfields, located in Alaska, experienced the largest oil spill ever recorded for that region (over

ORDER ON MTN
TO DISMISS - 1

200,000 gallons) as a result of internal corrosion of the pipelines. Six months later, Prudhoe Bay shutdown production following the discovery of severe corrosion and a second oil spill from another corroded pipeline. As a result of the shutdown, the price of Prudhoe Bay's publicly traded units plummeted from $87.89 to $76.85.

Defendant BP Exploration Alaska, Inc. ("BPXA") holds oil and gas interests in, and shares control of, Prudhoe Bay. BPXA is an indirect wholly-owned subsidiary of Defendant BP plc[1] and an indirect subsidiary of BP America, Inc. ("BP America"). Defendant Malone was Chairman and President of BP America in 2006 and BP plc's chief representative in the United States. Defendant Marshall was President of BPXA from 2001 through 2006. Defendant Johnson was BPXA's Senior Vice President of the Greater Prudhoe Bay Unit during the Class Period[2] and was primarily responsible for the operation and maintenance of the Prudhoe Bay pipelines.

BPXA entered into a trust agreement which created the BP Prudhoe Bay Royalty Trust (the "Trust"). The Trust holds a Royalty Interest in the production of oil from Prudhoe Bay. The trust agreement sets out four main obligations to which BPXA and BP plc must perform with respect to the Trust's Royalty Interest: (1) BPXA is responsible for making royalty payments to the Trust which in turn are distributed, through the Trust's Trustee, to the Trust's Unit Holders; (2) BP plc must provide financial support to BPXA if BPXA is unable to make the required royalty payments to the Trust; (3) BPXA is required to provide the Trustee with truthful and accurate information regarding the Royalty Interest, to be used to fulfill the Trust's disclosure obligations under the securities law; and (4)  BPXA is solely responsible for Prudhoe Bay's operations, including maintenance and production, and is required to maintain and operate Prudhoe Bay according to the "Prudent Operator Standard."

On May 1, 2007, Plaintiffs, purchasers of the Trust Units during the Class Period, filed a Consolidated Amended Class Action Complaint for securities fraud causes of action alleging Defendants violated Section 10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities Exchange Commission ("SEC") Rule 10b-5 Rule.  The Complaint alleges that Defendants made numerous materially

---

[1] The full name of "BP plc" was not provided.

[2] Class Period is from March 31, 2005 through February 5, 2007.

ORDER ON MTN
TO DISMISS - 2

false and misleading representations in SEC filings and in public statements regarding Prudhoe Bay's operation, maintenance, production, the March 2006 oil spill and the subsequent shutdown. Specifically, Plaintiffs allege that Defendants' statements were false and misleading in the following manner: (1) BPXA failed to disclose that it was not regularly running a corrosion monitoring device called a "smart pig" (or detection system) through its pipelines to detect corrosion; (2) BPXA failed to disclose that it had not conducted a regular maintenance pigging (cleaning program) for its pipelines; (3) BPXA gave priority to budget cuts over safety and maintenance concerns; and (4) BPXA had received repeated warnings from employees that its inadequate corrosion monitoring program increased the likelihood of accidents and oil spills. Plaintiffs claim they suffered damages because Defendants' conduct caused the price of the Trust Units to be inflated only to drop sharply after the Defendants disclosed the true conditions at Prudhoe Bay.

Defendants now move, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss all of Plaintiffs' causes of action for failure to state a claim. Defendants make four primary arguments: (1) Plaintiffs do not adequately plead fraud; (2) the alleged misrepresentations concerning future oil production are forward-looking statements that are protected by the safe harbor provision of PSLRA; (3) Plaintiffs' reliance on the group pleading doctrine is improper; and (4) Plaintiffs' 20(a) claim fails as a matter of law.

**Discussion**

## I.     Failure To State A Claim - Standard To Be Applied

In determining whether Plaintiffs' Complaint states a claim upon which relief can be granted, the Court must: (1) accept as true all material allegations in the complaint; (2) make all reasonable inferences to be drawn from them; and (3) construe the allegations in the complaint in the light most favorable to the plaintiffs. NL Industries, Inc. v. Kaplan, 792 F. 2d 869, 898 (9th Cir. 1986). A complaint should not be dismissed if the plaintiffs can prove *any set of facts* to support a claim that would merit relief. Bell Atl. Corp v. Twombly, 127 S. Ct. 1955 , 1965-1969 (2007); Cahill v. Liberty Mut. Ins. Co., 80 F. 3d 336, 337-338 (9th Cir. 1996) (emphasis added).

**II.     Heightened Pleading Standards For Claims Of Fraud**

In any averment of fraud or mistake, the plaintiff must state with particularity the circumstances constituting the fraud or mistake. Fed. R. Civ. P. 9(b). For claims of securities fraud, the plaintiff must also satisfy the heightened pleading standard of the Private Securities Litigation Reform Act (PSLRA).

The PSLRA provides that in any private action in which the plaintiff alleges that the defendant made an untrue statement of material fact or omitted to state a material fact, the complaint must:

> [S]pecify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1). The plaintiff must attribute the misleading statements upon which his or her claim is based to a particular defendant. The PSLRA further provides:

> [O]nly on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged...state with particularity facts giving rise to a ***strong inference that the defendant acted with the required state of mind***.

15 U.S.C. § 78u-4(b)(2) (emphasis added). If the plaintiffs fail to satisfy the PSLRA's heightened pleading standard, the Court must dismiss the Complaint. 15 U.S.C. § 78u-4(b)(3)(A).

**III.     Section 10(b) Liability**

To plead securities fraud under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 of the SEC, 17 C.F.R. § 240.10b-5, the plaintiffs must allege, in connection with the purchase or sale of securities: (1) a misstatement or omission of fact (2) made with scienter (or intent to defraud) (3) on which plaintiffs relied (4) which proximately caused plaintiffs' injuries. <u>Dura Pharms, Inc. v. Broudo</u>, 544 U.S. 336, 341-42 (2005).

    **A.     <u>Scienter</u>**

Within the context of Section 10(b), the Supreme Court has defined "scienter" as a "mental state embracing intent to deceive, manipulate, or defraud." <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 n.12 (1976). Under the PSLRA, the plaintiffs "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." <u>Janas v. McCracken (In re Silicon Graphics Inc. Sec.Litig.)</u>, 183 F.3d 970, 974 (9th Cir. 1999). The Court must consider "all reasonable inferences to be drawn from the allegations, including inferences unfavorable to plaintiffs."

ORDER ON MTN
TO DISMISS - 4

Gompper v. VISX, Inc., 298 F. 3d 893, 897 (9th Cir. 2002). If there are other inferences of nonfraudulent intent, the fraudulent inference must be cogent and at least as compelling as those other inferences. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2504-05 (2007).

### 1.    Motive Is Not Required To Plead Scienter

Defendants contend that Plaintiffs failed to allege that Defendants acted with scienter because the Plaintiffs failed to allege any motive on behalf of Defendants to make false and misleading statements. (Defs.' Mot. at 1.)  Plaintiffs do not dispute that no motive was provided.

While conceding that motive is not a required element of scienter (Defs.' Reply at 2.), Defendants still seem to insist motive is necessary, arguing that if Plaintiffs do not adequately explain why Defendants did what they did, intent to defraud cannot be proven. Defendants are incorrect. Motive may be relevant in weighing whether Defendants had the intent to defraud, but it is not necessary. See Tellabs, 127 S. Ct. at 2511 (absence of a motive allegation is not fatal). Instead, "allegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint." Id. Scienter can be established through contemporaneous information or data available to the defendants that contradicts their public statements. Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F. 3d 1226, 1230 (9th Cir. 2004).

### 2.    Plaintiffs' Allegations Adequately Plead Scienter

Plaintiffs allege that Defendants' statements about Prudhoe Bay's maintenance, operation, and condition of the pipelines in SEC filings throughout the Class Period, as well as various press releases and interviews, were false because (1) Defendants knew that the pipelines were in poor condition and  (2) the pipelines were not being maintained in accordance with the Prudent Operator Standard.  Defendants strongly deny that they made false statements because they claim they were unaware of any problems until after BPXA conducted remedial measures. However, for purposes of this motion, this argument is unpersuasive given the litany of alleged facts indicating otherwise.

For example, Plaintiffs' allege that: (1) BPXA discontinued smart pigging and maintenance pigging in 1992 for one pipeline and 1998 for the other, reduced its pipeline corrosion monitoring staff by 25%, and operated without key personnel for years (Am. Compl., ¶¶ 76, 200.); (2) red flags were raised about

the condition of the pipeline as far back as 2000, and BP admitted that the pipelines had known interior and exterior corrosion damage three years before the shutdown; (3) in response to the corrosion issues, BP downgraded the maximum pressure allowed within the line to help guard against rupturing its walls (Id., ¶¶ 107, 200.); (4) BPXA was also told by employees that they predicted a "major catastrophic event" as a result of the "cost cutting" and "serious corrosion damage." (Id., ¶ 249.); and (5) "most pipeline operators demonstrate a higher standard of care than BPXA" and, that despite these known facts and risks, Defendants continued to make representations that maintenance problems had been addressed and that they were not aware of the serious corrosion problem (Id., ¶¶ 111, 162.). The Court finds these alleged facts give rise to a strong inference that the Defendants acted with deliberate recklessness, if not intent, when they made representations about the maintenance, operation and condition of the pipelines.

Plaintiffs also allege that Defendants misrepresented the projection of future net oil production because Defendants failed to disclose the improper maintenance. Plaintiffs assert that the improper maintenance created a material risk that a shutdown of production would be necessary and that, as a result of a shutdown, net production would fall below 90,000 barrels per day. Defendants argue that, at most, the allegations regarding future oil production support that Defendants acted negligently, which is insufficient to establish a strong inference of deliberate recklessness. DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 391 (9th Cir. 2002).

In support of their assertion, Defendants claim that they were not aware of the problems with the pipelines and still believed that oil production would return to previous levels until BPXA received the "Miller and Lents" report in January 2007.[3] However, the alleged facts adequately support a strong inference that Defendants knew their production projections were less than accurate and misleading. For example, it is alleged that Defendants did not change their projections until 2007, despite the spills, shutdown, and numerous investigations indicating serious management and maintenance problems. Although Defendant Malone testified that "in retrospect" there were gaps in BPXA's maintenance program,

_____

[3] The Miller and Lents report was not attached to or referenced in the Complaint and none of its contents are known except for what is asserted in Defendants' Motion to Dismiss. Because it falls outside of the Complaint, under 12(b)(6), the Court cannot consider the report. See Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 925 (9th Cir. 2001).

Plaintiffs adequately alleged that Defendants were well aware that BPXA did not have an adequate maintenance program. It is not merely fraud by hindsight, as Defendants argue, to predict 90,000 barrels per day for several more years when Defendants knowingly refused to implement corrective measures.

**B.**     **Safe Harbor Provision**

The PSLRA creates a safe harbor for "forward-looking statements."  A forward-looking statement is any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues. <u>Knollenberg v. Harmonic, Inc.</u>, 152 Fed. Appx. 674, 678 (9th Cir. 2005); 15 U.S.C. § 78u-5(c). A forward-looking statement cannot be the basis for 10(b) liability if the statement falls under one of two prongs: (1) the statement is accompanied by meaningful cautionary language; or (2) in the absence of cautionary language, the plaintiffs do not allege that the statement was made with actual knowledge that the statement was false or misleading. 15 U.S.C. § 78u-5(c)(1)(A).

Defendants argue that their statements regarding projections of future oil production at Prudhoe Bay in the SEC filings are immune from liability under the safe harbor provision because: (1) each statement was accompanied by meaningful cautionary language and (2) Plaintiffs failed to allege that Defendants had actual knowledge that the daily oil production would decline earlier than predicted. Plaintiffs do not dispute that the statements made in the SEC filings were forward-looking statements.

**1.**     **Meaningful Cautionary Language**

In order to be meaningful, a cautionary statement must be more than a recitation of mere generalized risks or mere boilerplate language which could be applicable to any business venture. <u>In re Champion Enters., Inc., Sec. Litig.</u>, 144 F. Supp. 2d 848, 859 (E.D. Mich. 2001). It must identify "important factors that could cause *actual results* to *differ materially* from those in the forward-looking statement." 15 U.S.C. §78u-5(c)(1)(A)(i) (emphasis added). The language must convey substantive information about factors that realistically could cause different results from those projected. <u>In re Metawave Commc'ns Corp. Securities Litig.</u>, 298 F. Supp. 2d 1056, 1086 (W.D. Wash. 2003).  Defendants argue that the Trust's quarterly and annual forms filed with the SEC during

the Class Period regularly identified risk factors that could cause actual results to differ from projected results. (Defs.' Mot. at 12,  n.6.) The SEC filings discussed by Defendants will be addressed in turn.

### Trust's Annual and Quarterly Reports from March 2005 through November 2006
### (FY 2003 Form 10-K; FY 2004 Form 10-K; FY 2005 Form 10-Qs)

In support of their argument that the Trust's filings contained meaningful cautionary language, Defendants point to the following statements:

> [T]he Trustee is unable to predict future changes in...oil production levels,...[and] the Trust's future results of operations and other forward-looking statements contained in this item and elsewhere in this report involved a number of risks and uncertainties.  As a result of variations in such factors, actual results may differ materially from any forward looking [sic] statement....

(Defs.' Mot. at 12; Lundsgaard Decl., Exs. A, B, C, D, E.) Defendants' argument that this language "expressly warned investors about the risks associated with the projections of future oil production from the Prudhoe Bay field" is unavailing. This language does nothing more than to convey a general caution that actual results may differ from a "number of risks and uncertainties." Indeed, from March 2005 through November 9, 2005, the Trust's filings failed to provide any explanation of what those "risks and uncertainties" entailed. This boiler plate language is not meaningful and therefore not protected by the safe harbor provision.

### Trust's Annual Report for 2005 (FY 2005 Form 10-K)

Next, Defendants argue that the Trust's Annual Report filed on March 16, 2006 provided meaningful cautionary language in several different statements. In support of this argument, Defendants point to the language: "Production from the Prudhoe Bay field could be interrupted by damage...from natural disasters, accidents, or deliberate attacks." (Id., Ex. F, p. 25.) Defendants argue that the risks associated with the severe corrosion were incorporated under this language. (Defs' Mot. at 12, n.6.) However, Defendants' own statements contradict this contention. For example, Defendants' 2007 Annual Report contained a separate section devoted to the production impacts of pipeline damage, supporting a strong inference that Defendants clearly understood that the risks associated with corroded pipelines are distinct from the risks associated with natural disasters or deliberate attacks. (Lundsgaard Decl., Ex. L, p. 28.) The 2005 Annual Report language is also a recitation of mere generalized risks.

This also holds true for the other statement cited by the Defendants: "BPXA's...production assumptions and projections are predicated upon a reasonable estimate of hydrocarbon allocation between oil and condensate." (Defs.' Reply at 7.) Although this statement may be truthful, it only provides oil production projections based on chemical allocation and provides no substantive information about other factors -- such as corrosion -- that realistically could cause different results from those projected.

### Trust's Second Quarterly Report for 2006 (Q2 FY 2006 10-Q)

Plaintiffs appear to concede, and this Court agrees, that the second quarterly report for 2006 provides meaningful cautionary language. The report provides risk warnings such as: (1) the shutdown may result "in materially reduced distributions or no quarterly distributions...for an indefinite period;" (2) "oil production will be reduced by an estimated 400,000 barrels per day as a result of the shutdown;" (3) the "Trustee is unable to estimate the magnitude or duration" of the shutdown's effect; (4) if oil production goes below 90,000 barrels per day, there will be an adverse effect of royalty revenues; and (5) "[i]f the [oilfield] should be completely shut down during the entire fourth quarter of 2006 and any subsequent quarter, the Trust would receive no revenues with respect to those periods." (Lundsgaard Ex. I, p. 14-15.) These statements are more than recitation of mere generalized risks.

Instead, Plaintiffs argue that this cautionary language is invalid because the Trust and BPXA claimed that oil production had returned to its pre-shutdown level in the third quarterly report on November 9, 2006. (Defs.' Mot. at 20, n. 21.; Lundsgaard Ex. J, p. 17; Am Compl. ¶ 218) Although the third quarterly report did not include specific risk language, it states that the language that was provided in the third quarterly report "supplements [the] risk factor" described in the second quarterly report. In doing so, the Defendants did not repeal the warnings, but, instead, added to them. Therefore, the statements made in the second quarterly report are protected by the safe harbor provision.

While Defendants are correct in that the statements made in the second quarterly report are protected, it does not alter the analysis or conclusion that the complaint in its entirety adequately pleads fraud.

### 2.   Actual Knowledge

"A [projection] is actionably false if there is no reasonable basis for the belief or the speaker is aware of undisclosed facts tending to seriously to undermine the statements' accuracy." Knollenberg, 152 Fed. Appx at 678. Claims that a defendant "could have" or "should have" known that the statements were false are insufficient to satisfy the standard. Id. at 678. Defendants' argument is two-pronged. First, Defendants argue that Plaintiffs do not allege that BPXA or any other defendant had reason to believe that the projection was false at the time it was made. Instead, Defendants assert that Plaintiffs make only conclusory statements that Defendants knew about and failed to disclose the deficit maintenance of the pipeline. Second, Defendants deny that they knew their projection statements were false by pointing to the fact that BPXA promptly notified the Trust in January 2007 as soon as it had a basis to revise its estimate of future oil production. Defendants' arguments are unpersuasive.

Plaintiffs allege facts with particularity that Defendants were aware of undisclosed facts tending to seriously undermine their statements' accuracy. For example, it is alleged the Trust claimed in its third quarter report (Q2 FY 2006) that oil production had returned to pre-shutdown levels, when in fact it had not. As noted above, Plaintiffs also allege that Defendants were aware of the numerous red flags that had been raised about the conditions of the pipelines months, if not years, before January 2007. These red flags provide a strong inference that there were more than enough base to revise future production projections in the SEC filings prior to January 2007.  Thus, for purposes of this motion, Plaintiffs have satisfactorily plead "actual knowledge" on Defendants' part.

### C.   Group Pleading Doctrine

Under the group pleading doctrine, there is a presumption that allegedly false and misleading group-published information is the collective action of officers and directors. Decker v. Glenfed, Inc., 60 F. 3d 591, 593 (9th Cir. 1995). "Group-published information" is information contained in documents such as annual reports and press releases. In re Secure Computing Corp. Sec. Litig., 120 F. Supp. 2d 810, 821 (N.D. Cal. 2000). Thus, Plaintiffs can attribute statements to individual defendants based on their positions, rather than pleading facts that show that a defendant actually made, authored, or communicated a statement.

ORDER ON MTN
TO DISMISS - 10

To rely on this presumption, Plaintiffs' Complaint "must contain allegations that...[the defendant] either participated in the day-to-day corporate activities or had a special relationship with the corporation, such as participation in preparing or communicating group information at particular times." Decker, 60 F. 3d at 593. Defendants argue that Plaintiffs' reliance on the group pleading doctrine is misplaced based on two reasons: (1) the PSLRA abrogated the group pleading doctrine; and (2) even if the doctrine survived the enactment of the PSLRA, it does not apply in this case.

Although the Ninth Circuit has yet to determine whether the group pleading doctrine survived the PSLRA, a majority of district courts within the Ninth Circuit which have ruled on the issue have concluded that it does. See e.g., In re PETsMART, Inc. Sec. Litig., 61 F. Supp. 2d 982, 997 (D. Ariz. 1999); Pegasus Holdings v. Veternary Ctrs. of Am., Inc., 38 F. Supp. 2d 1158, 1165 (C.D. Cal. 1998); In re Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d 1096, 1108 (D. Nev. 1998); In re Secure Computing Corp. Sec. Litig., 120 F. Supp. 2d 810, 821-22 (N.D. Cal. 2000).

There is some authority contra (S. Ferry LP #2 v. Killinger, 399 F. Supp. 2d 1121, 1143 n. 8 (W.D. Wash. 2005); In re Immune Response Sec. Litig., 375 F. Supp. 2d 983, 1028-30 (S.D. Cal. 2005)), but because there is no binding authority that the PSLRA abrogated the group pleading doctrine, this Court joins with those majority of Ninth Circuit district courts that have ruled on the issue and finds that the group pleading doctrine survives the PSLRA.

Plaintiffs have adequately alleged that Defendants have a special relationship with the Trust and had involvement in the preparing of the Trust's SEC filings because it is alleged that: (1) the trust agreements explicitly provide that BPXA is responsible for the information in the Trust's SEC filings (Am. Compl., ¶ 48), and (2) the Trust was dependent on BPXA to provide it with information regarding the Royalty Interest for disclosure to investors. (Id., ¶ 47). Although Defendants argue that none of the individual defendants were employed by the Trust, Defendants provide no authority that the individual defendants have to be  actual employees rather than simply having a special relationship with the Trust as Plaintiffs allege.

**IV.   Plaintiffs' Section 20(a) Claim**

In order to prove a prima facie case under Section 20(a), a plaintiff must prove: (1) "a primary violation of federal securities law" and (2) "that the defendant exercised actual power or control over the primary violator." No 84 Employer-Teamster Joint Counsel Pension Trust Fund v. America West Holding Corp., 320 F. 3d 920, 945 (9th Cir. 2003). Whether the defendant is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions. Id. "Control" is defined in the regulations as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

As stated above, Plaintiffs have adequately plead a primary violation of federal securities law. Thus, the only remaining issue concerning the 20(a) claim is whether the Complaint adequately alleges that the individual defendants exercised control over BPXA during the Class Period.

The Court finds that Plaintiffs' allegations are sufficient to establish that both BP plc and the individual defendants were involved in the day-to-day activities of BPXA. Although Defendants assert that BPXA is managed independently, Plaintiffs' Complaint provides several allegations that BP plc, as a parent of BPXA, exercised control over BPXA. Plaintiffs allege that BP plc oversaw the operations of BPXA, made decisions about maintenance and production issues at Prudhoe Bay, and issued press releases about the conditions of the Prudhoe Bay pipeline. (Am. Compl. ¶¶ 146-50, 159, 166, 172, 185, 190-92, 196, 213.) Also, they allege that BP plc made the August 2006 shutdown announcement. (Id., ¶ 155.)

Defendants also contend that Plaintiffs did not adequately allege that each defendant was involved in the day-to-day operations of BPXA. However, the Complaint asserts: (1) Defendant Malone made public statements on behalf of BPXA and BP plc regarding the shutdown at Prudhoe Bay and maintenance repairs (Id., ¶¶ 29, 159-60, 162, 206.); and (2) Marshall and Johnson occupied  positions of control at BPXA, and both spoke publicly on behalf of BPXA. (Id., ¶¶ 27-28, 78, 112, 115, 123, 140-43, 153, 168, 182-83, 193, 202-03, 206, 210.) It is not necessary to show actual participation or the exercise of power

to be derivatively liable under section 20(a). <u>No 84 Employer-Teamster Joint Counsel Pension Trust Fund v. America West Holding Corp.</u>, 320 F. 3d 920, 945 (9th Cir. 2003).

To the extent that Plaintiffs present evidence at a later stage of the proceedings demonstrating such control, the individual defendants will be given the opportunity to assert good faith defenses or lack of participation. <u>Id</u>. At this juncture, however, the allegations are sufficient to support an inference that the individual defendants controlled BPXA and its operations.

**Conclusion**

There are adequate allegations in Plaintiffs' Complaint that Defendants acted with the requisite intent to commit fraud under the heightened pleading standard of the PSLRA when they made representations about the maintenance, operation and condition of the pipelines, as well as estimates of future net oil production. Excluding the Trust's second quarterly report for 2006, Defendants' forward-looking statements in the Trust's SEC filings are not protected by the safe harbor provision of the PSLRA because the statements are not accompanied by meaningful cautionary language and/or Plaintiffs adequately allege that Defendants had actual knowledge that their statements about operating the oilfields in accordance with the Prudent Operator Standard and future projections were false.

Further, although the Ninth Circuit has not yet ruled on whether the group pleading doctrine survived the enactment of the PSLRA, this Court joins with the majority of courts within the Ninth Circuit which have ruled on the issue and finds that the doctrine still applies. Finally, under Plaintiffs' 20(a) claim, Plaintiffs adequately allege that a primary violation of federal securities law occurred. Whether the defendants are "controlling persons" is a fact-intensive inquiry, and Plaintiffs' allegations in this regard are sufficient to survive a 12(b)(6) challenge. Therefore, Defendants' motion to dismiss is DENIED.

DATED:  October 26, 2007.

/s/ Marsha J. Pechman
Marsha J. Pechman
United States District Judge

ORDER ON MTN
TO DISMISS - 13